Entered on Docket
February 09, 2009

_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                     )
                                           )        BK-S-08-21594-BAM
BETCORP LIMITED (IN LIQUIDATION),          )
                                           )        Chapter 15
              Petitioner.                  )
                                           )        Date:       Oct. 29 and Dec. 3, 2008
                                           )        Time:       2:00 p.m.
                                           )        Courtroom:  3
                                           )
_____    )

**OPINION ON PETITION FOR RECOGNITION**

*Table of Contents*

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    **A.**    **Betcorp's Gaming Operations and Corporate Governance** . . . . . . . . . . . . . . . . . . 3
    **B.**    **Changes in United States Gaming Law, Betcorp's Cessation of Operations, and Its**
        **Subsequent Winding Up** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    **C.**    **1st Technology's Claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. RECOGNITION OF BETCORP'S WINDING UP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    **A.**    **Is Betcorp's Winding Up a "Foreign Proceeding" as Defined by 11 U.S.C. § 101(23)?**
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        *1.*    *A "Proceeding"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        *2.*    *Judicial or Administrative in Character* . . . . . . . . . . . . . . . . . . . . . . . . . 16
        *3.*    *A Collective Proceeding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        *4.*    *Located in a Foreign Country* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        *5.*    *Authorized or Conducted under a Law Related to Insolvency or the Adjustment*
            *of Debts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        *6.*    *Foreign Court's Control or Supervision of the Debtor's Assets and Affairs*
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        *7.*    *Reorganization or Liquidation Purpose* . . . . . . . . . . . . . . . . . . . . . . . . . 23
    **B.**    **Does Betcorp's Winding Up Proceeding Meet the Requirements for Recognition**

1

*Under Section 1517?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    1.  *Is the Foreign Proceeding for Which Recognition Is Sought a Foreign Main Proceeding or Foreign Nonmain Proceeding?* . . . . . . . . . . . . . . . . . . . . . 24

        i.    Factors Relevant to the COMI Determination . . . . . . . . . . . . . . . . . 25

        ii.   Timing of the COMI Determination . . . . . . . . . . . . . . . . . . . . . . 31

        iii.  Betcorp's COMI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    2.  *Is the Foreign Representative Applying for Recognition a Person or Body?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    3.  *Does the Petition Meet the Requirements of Section 1515?* . . . . . . . . . . . 37

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

\* \* \* \* \*

Bruce A. Markell, Bankruptcy Judge.

## I. Introduction

Simon John Cathro, an Australian liquidator, seeks recognition under chapter 15 of the Bankruptcy Code for the ongoing winding up and liquidation, in Australia, of Betcorp Limited, an Australian company. In particular, the petition seeks recognition of the winding up as a "foreign main proceeding." If granted, that recognition would entitle Betcorp to the protections of a variety of Bankruptcy Code provisions, the most important of which for Mr. Cathro's purposes is the automatic stay. *See* 11 U.S.C. § 1520(a)(1) (providing that 11 U.S.C. § 362 applies to a chapter 15 debtor upon recognition).

A United States company, 1st Technology LLC, opposes recognition. It has sued Betcorp for patent infringement, and that lawsuit is currently pending in the United States District Court for the District of Nevada. 1st Technology would prefer (and believes it is entitled) to continue to litigate its claims in a United States court, rather than pursue those claims in Betcorp's Australian liquidation.

Upon consideration of the evidence presented and for the reasons stated below, the court grants Mr. Cathro's petition for recognition of the Australian voluntary winding up as a foreign main proceeding under chapter 15 of the Bankruptcy Code.[1]

---

[1]This court has jurisdiction over this proceeding under 28 U.S.C. § 157(b)(1), as this proceeding is a core proceeding, *id.* § 157(b)(2)(P), and this district has entered an order, authorized by 28 U.S.C. § 157(a), referring such matters to this court. Nev. Loc. R. 1001. Given 1st

## II. BACKGROUND

Betcorp was formed and registered as a company under Australian law on February 26, 1998. Declaration of Simon John Cathro ¶ 9 (dkt. #6) ("Cathro Decl."). When it was active in business, Betcorp was a publicly-traded entity regulated by the Australian Securities and Investments Commission ("ASIC").[2] *Id.* From the time the company was formed until it ceased operations on October 31, 2006, its business activity involved a mélange of gaming activities, conducted through a variety of affiliate and subsidiary entities.[3] Supplemental Declaration of Simon John Cathro ¶ 10 (dkt. #35) ("Cathro Supp."). The company ceased operations after changes in United States law made its business model unworkable. Betcorp's members then voted to liquidate the company through a members' "voluntary winding up" under Australian law, a process which is ongoing. *See* Exhibits to Verified Petition (dkt. #2, ex. 5 and 6). This process required the appointment of at least one liquidator registered with the ASIC. Throughout most of the winding up process, the appointed liquidators have been in discussions with 1st Technology regarding the patent infringement claims. These events are discussed in more detail below.

### A.    *Betcorp's Gaming Operations and Corporate Governance*

When it first began business operations, Betcorp initially created and operated a single subsidiary: Consolidated Sportsbet Australia Pty Limited. Transcript of Testimony of Simon John

_____

Technology's pending lawsuit against Betcorp, venue in this district is appropriate under 28 U.S.C. § 1410(2).

[2]For a period of approximately eight months in 2006, Betcorp also was listed on the London Stock Exchange's Alternative Investment Market. Cathro Decl. ¶ 10. The company was de-listed in conjunction with its termination of operations and liquidation.

[3]"Gaming" is generally regarded as a mild euphemism for gambling, although the OXFORD ENGLISH DICTIONARY indicates that "gaming" was in use to describe wagering and other aleatory activities more than 225 years before "gambling" found its way into the language. *Compare* 6 OXFORD ENGLISH DICTIONARY 342-43 (2d ed. 1989) (definition of gambling) *with id.* at 349 (definition of gaming).

Cathro, Hearing on Oct. 29, 2008, at p. 54 ("TR").[4]   Sportsbet operated solely in Australia, and employed between 20 and 30 people.[5]  *Id.* at 54-55.  By the end of 2002, Betcorp's management decided to diversify the company's gaming operations.  To that end, on January 23, 2003, the company began offering on-line and telephone gaming services through a subsidiary located in Antigua named Tasman Gaming.  Cathro Supp. ¶ 12.  This business operated under a gaming license issued by the government of Antigua and Barbuda, West Indies.  *Id.*

Tasman eventually became the company's primary revenue generator.  TR, p. 69.  However, Betcorp created and operated other subsidiaries in order to further the company's business strategy of providing a "one-stop shop" for online gamblers.  *See* Betcorp's "Annual Report and Accounts 2005" (dkt. #35, ex. 4-8); *see also* TR, p. 65.  As of 2005, Betcorp owned and operated the following subsidiaries:

- BCL (Asia) Pty Limited (incorporated in Australia);

- Tasman Gaming, Inc. (incorporated in Antigua);

- WWI AG Limited (incorporated in Antigua);

- Tasman Investments, Inc. (incorporated in Antigua);

- Swan Holdings (incorporated in Antigua);

- Tartar Sauce Investments, Ltd. (incorporated in Antigua);

- Sinsational Intertainment, Inc. (incorporated in Antigua);

- Oasis Antigua Holdings, Inc. (incorporated in Antigua);

- Applewick Holdings Ltd. (incorporated in Cyprus);

---

[4]The testimony of Mr. Cathro and Mr. Ian Walker, one of Betcorp's legal counsel, was taken by video transmission from Australia, after each witness had submitted his direct evidence by written declaration.  Although the parties stipulated to the taking of this testimony by video transmission, the court could have found good cause to permit such method of receiving evidence given the cost of bringing the witnesses to the United States for only a half-day of testimony.  *See* FED. R. CIV. P. 43(a) (made applicable to this proceeding by FED. R. BANKR. P. 9017).

[5]Betcorp sold Sportsbet in October of 2004.  TR, pp. 53, 92.

4

- Betcorp (UK) Limited (incorporated in the United Kingdom); and

- Cyber Processing Corp. Ltd. (incorporated in the Federation of St. Kitts and Nevis).

Cathro Supp. ¶ 11.[6]

Although Betcorp was involved, through these subsidiaries, in business operations in several countries, Australia remained its administrative and executive nerve center.  Reflecting the fact that the majority of shareholders resided in or were located in Australia, and that it was an Australian corporation, Australian law governed all corporate activities.  Cathro Decl. ¶ 13.  The actual statistics overwhelmingly support a center of member ownership in Australia.  According to Mr. Cathro, as of September 24, 2007:

- 1,468 of the 1,606 shareholders of Betcorp, or 91.4%, resided in Australia;

- 4,268,617 of the 6,353,426 Betcorp shares (or 67.2%) were held by members who resided in Australia; and

- 138 members (or 8.6%) resided in jurisdictions outside of Australia, of which nine members (or 0.05%) resided in the United States and held but 10,168 (or 0.02%) of the shares of Betcorp.

*Id.*  As an Australian company, all Betcorp shareholder meetings have taken place in Australia.  Cathro Supp. ¶ 6.

With respect to management, most Betcorp directors have been Australian-born individuals.  Of the twenty-five individuals that have served as directors, only five did not reside in Australia.  Cathro Supp. ¶ 1.   Four of these non-Australian directors resided in the United Kingdom, and one resided in Antigua.  *Id.*  No Betcorp directors resided in the United States during their tenure.  *Id.*  These directors participated in both telephonic and in-person meetings.  Cathro Supp. ¶ 7.  When there were

---

[6]Betcorp also operated an information technology and marketing office in Toronto, Canada, which supported its various online gaming operations.  Cathro Decl. ¶ 12.

1    in-person meetings, the majority of them took place in Australia.  *Id.*

2        Corporate audits were performed by the Sydney, Australia offices of two accounting firms:

3    Ernst & Young (prior to 2006), and Grant Thornton (beginning in 2006).  Cathro Supp. ¶ 8.  Betcorp

4    filed income tax returns with the Australian Tax Office since its incorporation, and paid Australian

5    income tax on its earnings.  Cathro Supp. ¶ 9.  Finally, Betcorp's registered office has been in Australia

6    from its incorporation to present.   Cathro Decl. ¶ 11; TR, pp. 54-55.

7        **B.    Changes in United States Gaming Law, Betcorp's Cessation of Operations, and Its**

8            **Subsequent Winding Up**

9        On October 13, 2006, the United States passed the Unlawful Internet Gambling Enforcement

10    Act, Pub. L. No. 109-347, 120 Stat. 1884 (codified as 31 U.S.C. §§ 5361-67).  The Act prevented

11    Betcorp from receiving funds transfers related to gaming activities from United States customers.  This

12    was a major blow to Betcorp's business model since at the time of enactment, most of the company's

13    customers resided in the United States.  Cathro Decl. ¶¶ 14-16.

14        Immediately after the passage of the Unlawful Internet Gambling Enforcement Act, the

15    company ceased operations in the United States, and eventually ceased all operations completely.[7]

16    Cathro Decl. ¶ 15.  Preparations for the dissolution of the company were made, and in August of 2007,

17    the company engaged the services of two liquidators, Simon John Cathro and Simon Alexander

18    Wallace-Smith, of Deloitte Touche Tohmatsu.  Cathro Decl. ¶ 19.  An extraordinary general meeting

19    of the company, as provided for under Australian company law, was called for September 28, 2007.

20    Cathro Decl. ¶ 20.  At that meeting, held at the company's offices in Australia, the members voted to

21    appoint the liquidators and to begin a voluntary winding up.  The vote was 99.9% in favor.  *See* Cathro

22    Decl. ¶¶ 2, 20; *see also* Form 505 (dkt. #2, ex. 6, pp. 4-5).  On the day of their appointment, as part of

23    their statutory duty to pay all creditors of the company, the liquidators issued a Notice Inviting Formal

24

25    _____

26        [7]Soon after the company ceased operations, Tasman was sold to Bodog Entertainment.  TR,
    pp. 62-63.

6

Proof of Debt or Claim.  *See* Form 534 (dkt. #6, ex. 2, p. 18).  In administering this process, the liquidators became aware of 1st Technology's claims.

### C.    1st Technology's Claims

1st Technology is owned by Dr. Scott Lewis.  Dr. Lewis invented and patented a method and system for interactively transmitting multimedia information over a computer network, in a way that requires less bandwidth than prior art.  United States Patent No. 5,564,001 (filed June 24, 1994) (the "'001 patent").  *See* USPTO Patent Full-Text and Image Database, http://patft.uspto.gov/netahtml/PTO/srchnum.htm (search "5564001") (*last visited* Feb. 9, 2009).  According to Dr. Lewis, the method is useful to internet gaming companies because it enables a company to transmit data more quickly, using less resources, than would otherwise be the case.  Declaration of Dr. Scott Lewis ¶¶ 9-11 (dkt. #41).  Dr. Lewis, through 1st Technology,[8] asserts that Betcorp infringed the '001 patent (either directly or through contributory infringement or inducement), and has sought to vindicate those claims through legal processes undertaken in both the United States and Australia.  *Id.* at ¶¶ 22-39.

In early 2006, before Betcorp had ceased operations, 1st Technology sent a letter to Betcorp's offices in Australia, offering to license the '001 patent and other patents for use in Betcorp's operations.  Letter from William W. Flachsbart to Betcorp (Feb. 10, 2006) (dkt. #2, ex. 6, pp. 19-20).  This letter also alleged that Betcorp's technology infringed at least one patent owned by 1st Technology.  *Id.* Further letters followed on April 20, 2006, and July 21, 2006; neither of which were responded to by Betcorp in a manner satisfactory to 1st Technology.

On February 11, 2008, 1st Technology filed a complaint against Betcorp in the United States District Court for the District of Nevada, alleging infringement of the '001 patent.  1st Tech. v. Betcorp, No. 2:08-cv-00175.  Although 1st Technology did not immediately serve the complaint, its Australian

---

[8]Betcorp has not questioned that 1st Technology has standing to pursue claims of infringement of a patent originally issued to Dr. Lewis.

counsel faxed a letter to the liquidators, dated February 13, 2008, which set forth the claims and enclosed a copy of the complaint. Letter from Leon Zwier to Simon Cathro/Simon Wallace-Smith (dkt. #2, ex. 6, pp. 7-25). The letter requested additional information from Betcorp regarding some transactions in which Betcorp had been a participant. *Id.* Presumably, this information was sought to assist 1st Technology in the United States lawsuit, as well as in the Australian legal processes that would soon follow.

On April 16, 2008, 1st Technology submitted a proof of debt to the Australian liquidators. Letter from Leon Zwier to Ian Walker (April 16, 2008) (dkt. #2, ex. 7, pp. 2-4). The liquidators responded to this proof of debt with a request for further evidence, pursuant to Regulation 5.6.53(1) of Australia's *Corporations Regulations 2001*.[9] Letter from Simon Wallace-Smith to Leon Zwier (April 30, 2008) (dkt. #2, ex. 7, pp. 6-8).

1st Technology and the liquidators engaged in further communications, but the liquidators believed that the information received was insufficient to permit the liquidators to make a final decision on the proof of debt.[10] With the matter unresolved, 1st Technology then went forward with its United States lawsuit by formally serving it upon the liquidators on August 15, 2008. Return of Service (dkt. #2, ex. 7, pp. 25-27). Although Betcorp has appeared in the infringement lawsuit, it has not answered the complaint. The liquidators instead prefer to resolve 1st Technology's claims through the Australian winding up process.[11] This reasoning lead to Mr. Cathro's filing the petition for recognition on October

---

[9]This request was made pursuant to authority granted to the liquidators under Australian regulatory law. *See* Corporations Regulations 2001, *available at* http://www.comlaw.gov.au/ (click "Compilations - Current" under "Select Legislative Instruments (SLIs) and Statutory Rules (SRs)"; search for "F2008C00509") (*last visited* Feb. 9, 2009).

[10]The liquidators, as of the submission of this matter, still have not made a decision on the proof of debt. At the hearing on the petition for recognition, Betcorp indicated that the liquidators would grant additional extensions after the court's decision to allow 1st Technology to submit additional evidence regarding their proof of debt.

[11]The parties have stipulated to stay the patent infringement action pending this court's decision on Betcorp's recognition petition.

2, 2008 (dkt. #1).

### III. RECOGNITION OF BETCORP'S WINDING UP

Recognition of any proceeding as a foreign main proceeding requires several findings, and Mr. Cathro's request to recognize Betcorp's voluntary winding up in Australia is no different. As a preliminary matter, however, the court must determine whether Betcorp's winding up is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23). If 1st Technology is correct that the winding up fails to qualify under section 101(23), the matter ends there, and no recognition will be given. If, however, the winding up is a foreign proceeding, the court must look to section 1517(a) to see if Mr. Cathro has met his burden of proving that the winding up proceeding is entitled to recognition either as a "foreign main" proceeding or as a "foreign nonmain" proceeding. Each of these issues is discussed below.

### A.    Is Betcorp's Winding Up a "Foreign Proceeding" as Defined by 11 U.S.C. § 101(23)?

1st Technology argues that Betcorp's winding up is not a "foreign proceeding" within the meaning of chapter 15. It asserts, correctly, that (i) there is no lawsuit or legal proceeding pending in an Australian court (or anywhere else except the United States) involving any of Betcorp's creditors; (ii) Betcorp is not a bankrupt or in administration under Australian bankruptcy laws, or any other bankruptcy laws; and (iii) there is no lawsuit or other legal process by which a judge or other judicial officer directly supervises the liquidators' actions in the winding up. Based upon these facts, 1st Technology contends that Betcorp's actions are nothing more than a unilateral cessation of business followed by a private and unregulated settling of accounts.

1st Technology's interpretation of Australia's statutory scheme of liquidation is misguided. Both the text and existing interpretations of Australia's corporations statute indicate that an Australian voluntary winding up has all of the necessary elements of a "foreign proceeding" as that term is used in section 101(23). Although no United States court has examined section 101(23) in great detail, the court does not write without guidance. Chapter 15, which uses the term to define its scope, "incorporate[s] the Model Law on Cross-Border Insolvency" drafted by UNCITRAL, the United

9

Nations Commission on International Trade Law.   11 U.S.C. § 1501(a).  The statutory intent to meld

American law into international law is explicit in the text of section 1501(a), and also is expressed in

section 1508, which states that "[i]n interpreting this chapter, the court shall consider its international

origin, and the need to promote an application of this chapter that is consistent with the application of

similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508; *see also* HOUSE REPORT ON THE

BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005, H.R. REP. NO. 109-31,

pt. I, at 105 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 169 ("[Chapter 15] incorporates the Model Law

on Cross-Border Insolvency to encourage cooperation between the United States and foreign countries

with respect to transnational insolvency cases. . . . [These provisions are] intended to provide greater

legal certainty for trade and investment as well as to provide for the fair and efficient administration

of cross-border insolvencies, which protects the interests of creditors and other interested parties,

including the debtor.") [hereinafter "HOUSE REPORT"]; 8 COLLIER ON BANKRUPTCY ¶ 1501.01 (Alan

N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) (explaining the basis for chapter 15).

        Against this background, the scope of the Model Law's definition of "proceeding" is quite

relevant.  The Model Law's *Guide to Enactment*, published by UNCITRAL, states:

> To fall within the scope of the Model Law, a foreign insolvency proceeding needs to
> possess certain attributes. These include the following: basis in insolvency-related law
> of the originating State; involvement of creditors collectively; control or supervision of
> the assets and affairs of the debtor by a court or another official body; and
> reorganization or liquidation of the debtor as the purpose of the proceeding . . . .

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (UNCITRAL), UNCITRAL MODEL LAW

ON CROSS-BORDER INSOLVENCY WITH GUIDE TO ENACTMENT ¶ 23, at 10, U.N. Gen. Assembly,

UNCITRAL  30th  Sess.,  U.N.  Doc.  A/CN.9/442  (1997),  *available  at*

http://www.uncitral.org/uncitral/en/commission/sessions/30th.html  [hereinafter  "*Guide  to*

*Enactment*"].[12]

---

[12]As Congress noted, the *Guide to Enactment* is very useful in construing chapter 15.
"Interpretation of this chapter [15] on a uniform basis will be aided by reference to the Guide and the
Reports cited therein, which explain the reasons for the terms used and often cite their origins as well."

These attributes, as stated in the *Guide to Enactment*, follow from the text of Article 2(a) of the Model Law, which is codified almost word-for-word in this country in section 101(23).[13]

Section 101(23) states:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

This definition can be broken down in seven criteria or elements, each of which must be satisfied before Betcorp's winding up can be called a "foreign proceeding."  These elements are:

(i)    a proceeding;

(ii)   that is either judicial or administrative;

(iii)  that is collective in nature;

(iv)   that is in a foreign country;

(v)    that is authorized or conducted under a law related to insolvency or the adjustment of debts;

(vi)   in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

(vii)  which proceeding is for the purpose of reorganization or liquidation.

Each of these is analyzed below.

**1.    A "Proceeding"**

The first step in this analysis is to determine whether a "voluntary winding up" under Australian

---

HOUSE REPORT, *supra*, at 109.

[13]Article 2(a) of the Model Law and section 101(23) have only minor differences. Section 101(23) adds the two words "The term" at the beginning of the definition, uses the term "foreign country" instead of the Model Law's "foreign State", substitutes the phrase "under a law" instead of using the word "pursuant", and adds the phrase "or adjustment of debt" after "insolvency."  For purposes of this case, these are insignificant differences.

law is even a "proceeding."  1st Technology argues that it is not, since there is no petition or application to any court.  To an American ear, this argument has some initial appeal.  In cases under title 11, the term "proceeding" has a fairly circumscribed meaning – it is used to refer to in-court events, such as hearings, as well as being used to refer to self-contained lawsuits brought within a particular bankruptcy case, such as adversary proceedings.  *See* BLACK'S LAW DICTIONARY 1241 (8th ed. 2004) (definition of proceeding); *see also* Fed. R. BANKR. P. 7001.

In the context of chapter 15, however, the word "proceeding" requires a broader definition in order to achieve the statutory directive of interpretation consistent with the understandings and the usages of international law and the UNCITRAL Model Law.  Although not directly applicable under the circumstances, the *European Union Regulation on Insolvency Proceedings* is helpful with regard to the accepted meaning of the word "proceeding" in international insolvency law.[14]  Paragraph 10 of the introductory recitals of the EU Regulation states:

> Insolvency proceedings do not necessarily involve the intervention of a judicial authority; the expression "court" in this Regulation should be given a broad meaning and include a person or body empowered by national law to open insolvency proceedings.  In order for this Regulation to apply, *proceedings (comprising acts and formalities set down in law)* should not only have to comply with the provisions of this Regulation, but they should also be officially recognised and legally effective in the Member State in which the insolvency proceedings are opened . . . .

---

[14]The EU Regulation applies in cross-border cases among all members of the European Union except Denmark.  After its promulgation in 2000, it came into effect in 2002.  That the controlling instrument is a regulation rather than a law arises because the European Union was unable to agree, for nonbankruptcy reasons, on an earlier draft law, known as the European Union Convention on Insolvency Proceedings (the "EU Convention").   For a brief overview of the history and the current text of the EU Regulation, see Ian F. Fletcher, *The European Union Regulation on Insolvency Proceedings*, reprinted in INSOL INTERNATIONAL, CROSS-BORDER INSOLVENCY: A GUIDE TO RECOGNITION AND ENFORCEMENT, 15-45 (2003).

      Even though the EU Convention was never adopted, the *Guide to Enactment's* references to the EU Convention's text are still relevant and valid, inasmuch as the *Guide to Enactment* was drafted during a time when it was possible to think that the EU Convention would be adopted, and the final text of the EU Regulation is based upon and closely parallels the earlier text of the EU Convention.  These close connections are discussed in *In re* Ran, 390 B.R. 257, 264 n.3 (Bankr. S.D. Tex. 2008) (quoting the opinion of Mr. Advocate General Ruiz-Jarabo Colomer in Case C-1/04, *Proceedings brought by Staubitz-Schreiber*, [2006] E.C.R. I-701, 2005 WL 2138235 (ECJ Grand Chamber)).

COUNCIL REGULATION 1346/2000, 2000 O.J. (L 160), at 2, *available at* http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2000:160:0001:0018:EN:PDF (emphasis supplied) [hereinafter "EU Regulation"]. [15]

This excerpt identifies the essence of a "proceeding": acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice. In the context of corporate insolvencies, the hallmark of a "proceeding" is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets. In this case, that framework is provided by the Australian *Corporations Act (Cth) 2001*. [16] Under Australian law, this Act governs voluntary winding up, as well as a multitude of other procedures used to end a corporation's existence. Chapter 5 of the *Corporations Act*, entitled "External Administration," governs the termination of businesses through the appointment of an administrator or liquidator, and is applicable to Betcorp.

---

[15]The breadth of this definition is significant in light of the more restrictive scope of the EU Regulation. The EU Regulation only applies to collective proceedings which "entail the partial or total divestment of a debtor and an appointment of a liquidator." EU Regulation, at 4 (art. 1(1)). Section 101(23) and Article 2(a) of the Model Law, however, have a broader scope, extending to reorganization proceedings such as the United States' chapter 11 when a debtor in possession is in control.

[16]The court permitted Mr. Cathro to introduce the entire Australian *Corporations Act (Cth) 2001* into evidence, but that was not necessary. Rule 44.1 would have permitted the court to have looked to the version generally available on the Internet. *See* FED. R. CIV. P. 44.1 (made applicable to this proceeding by FED. R. BANKR. P. 9017) ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

The *Corporations Act* is divided into 10 chapters, consisting in total of over 2,000 pages. It is comprehensive, dealing with matters affecting all stages of the corporate life-cycle, from the formation and registration of corporate entities through termination of operations, liquidation and dissolution. Corporations Act (Cth) 2001, *available at* http://www.comlaw.gov.au/ (click "Compilations - Current" under "Acts"; search for "C2009C00042") (*last visited* Feb. 9, 2009) (The abbreviation "Cth" stands for "Commonwealth of Australia," the full name of that country, and is the official designator for laws enacted by Australia's federal government.)

In this opinion, sections of the *Corporations Act* will be cited as "CA." Although the *Corporations Act* was amended after submission of this matter, the amendments do not affect the analysis of whether Betcorp's winding up is entitled to recognition under chapter 15.

1st Technology argues that a voluntary winding up is not a proceeding because commencement of that type of process does not require an application or petition to any court.  Mr. Cathro responds that this bare fact obscures the nature of a voluntary winding up.  He argues that to understand the voluntary winding up process, the court must consider all of the *Corporations Act's* external administration provisions, along with the duties those provisions impose on a liquidator (who is necessarily appointed as part of a voluntary winding up).  *See CA § 495(1), CA § 499(1).*

Chapter 5 of the Australian *Corporations Act* is obviously intended to be read as an integrated whole.  It purports to contain all of the provisions necessary to wind up any company and has been interpreted to be the exclusive procedure under which any such winding up may occur.  *See* MICHAEL GRONOW, MCPHERSON'S LAW OF COMPANY LIQUIDATION ¶ 1.40, at 1-52 (5th ed. 2006); Rosalind Mason, *Local Proceedings in a Multi-State Liquidation: Issues of Jurisdiction*, 30 MELB. U. L. REV. 145, 160-61 & nn. 112-13 (2006) (citing ANDREW KEAY, MCPHERSON: THE LAW OF COMPANY LIQUIDATION 2-3 (4th ed. 1999).[17]  To augment this exclusivity, the provisions allow, but do not require, court involvement, and provide, in appropriate cases, for the conversion from voluntary winding up to court-supervised external administration, and vice versa.  *See CA § 459P* (setting out who may apply to a court for a company to be wound up in insolvency); *CA § 461* (setting out grounds other than insolvency upon which a court may wind up a company); *CA § 496* (explaining the duties of liquidators when a company turns out to be insolvent); *CA § 467B* (allowing the court to take control of a voluntary winding up); *CA § 482* (permitting the court to terminate or stay a court ordered winding up and return company control to the corporate principals).

So although a voluntary winding up may never be placed squarely in front of a judge, once the provisions of Part 5 are invoked, the nature of the process changes, and changes in ways that are beyond the debtor's control.  The terms of these changes are laid out in the statute, providing the necessary "act

---

[17]It also requires notice to the ASIC, the Australian regulatory agency responsible for and which oversees Australian corporations.  *CA § 5B*; *see* ROBERT P. AUSTIN & IAN M. RAMSAY, FORD'S PRINCIPLES OF CORPORATIONS LAW ¶ 3.140 (13th ed. 2007) (describing the functions of the ASIC.

and formalities" for conversion and supervision.

As an example, if a company initiates a voluntary winding up, and is found during the course of that winding up to be insolvent, the liquidator must convert to another type of administration or call a creditors' meeting. *CA § 496.* Either action will likely lead to court involvement. Similarly, if a corporation chooses liquidation under a type of court-supervised external administration known as a voluntary administration (not this case), and all creditors are paid 100 cents on the dollar, then that proceeding must be terminated and the company wound up under other Chapter 5 provisions. *See CA § 445FA*; *CA § 446A.* A court may also order the end of such a voluntary administration if it thinks a company is solvent. *CA § 447A.* Numerous other provisions of Chapter 5 also require conversion among the various types of external administration or otherwise govern the effects of conversion.[18]

Australian case law also indicates that viewing the voluntary winding up process as a "proceeding" is appropriate. As stated in Lofthouse v. Austl. Sec. Invs. Comm'n, (2004) 82 A.L.D. 481, ¶¶ 50-52, 2004 WL 674816 (Austl.):

> Subject to its being solvent and a Court's not having ordered that it be wound up in insolvency, a company may resolve by special resolution that it be wound up [*CA §§ 490, 491*]. If such a resolution is made, a liquidator must be appointed by the company in a general meeting [*CA § 495(1)*] and all the powers of the directors cease [*CA § 495(2)*]. If it should transpire that the company is insolvent, the liquidator may choose to apply to the Court under [*CA § 459P*] for the company to be wound up in insolvency, appoint an administrator of the company under [*CA § 436B*] or convene a meeting of the company's creditors [*CA § 496(1)*]. . . . Subject to the provisions of the Act as to preferential payments, the property of the company must be applied in satisfaction of its liabilities equally and, subject to the company's constitution, be distributed amongst its members according to their rights and interests in the company [*CA § 501*].

The fact that commencing this type of external administration terminates the authority of the company's directors, combined with the fact that the winding up cannot be stopped by the equity

---

[18]For example, the provisions of Chapter 5.2, regarding the appointment of a receiver, explain how the receiver's powers are affected when a company is being wound up. *CA § 420C.* The provisions of Chapter 5.3A, in section 436B, explains that a liquidator may appoint an administrator, which is something a liquidator might choose to do after determining the liquidator has a statutory duty to convert a winding up into some other time of external administration. Sections 459 and 462 also provide mechanisms for a liquidator to convert a proceeding from one type of external administration to another.

interest holders once they have passed the special resolution, lends further support to a finding that this Australian legal process is a proceeding.

1st Technology's sole argument on this issue – that the absence of an application or a petition to an Australian court proves the winding up is not a proceeding – is not persuasive given the explanation found in *Lofthouse* and this court's reading of the Australian *Corporations Act*. *See also* EU Regulation, Recital ¶ 10 ("Insolvency proceedings do not necessarily involve the intervention of a judicial authority; the expression 'court' in this Regulation should be given a broad meaning and include a person or body empowered by national law to open insolvency proceedings."). The court thus finds that an Australian voluntary winding up is a "proceeding" under section 101(23) and, by extension, chapter 15.

### 2.    Judicial or Administrative in Character

Section 101(23) requires that the proceeding be judicial or administrative in character. An Australian voluntary winding is, generally, a proceeding with an administrative character, although under certain circumstances the proceeding may temporarily become more appropriately characterized as judicial.

The Australian *Corporations Act* provides that a company commences a voluntary winding up by passing a "special resolution." *CA § 491*. Once passed, the liquidating company must appoint a liquidator that is registered with the ASIC. *CA § 495(1)*; *see* Part 9.2 of the *Corporations Act*. The initial actions of the liquidator, such as sending a notice of liquidation and requesting proofs of debt, have an administrative character. *See CA §§ 490-581*. The submission of proofs of debt and the ultimate payments to creditors are made pursuant to the administrative framework created by the *Corporations Act*. *Id.* If no party objects, and every creditor is paid in full, it is possible that the entire voluntary winding up may progress from commencement to final disbursal of funds and company de-

1   registration as a purely administrative proceeding.[19]

2          In order to protect creditors' rights, however, a voluntary winding up may change from a

3   proceeding with an administrative character to one with a judicial character.  As discussed in Part

4   III.A.6, *infra*, the actions of the liquidator are subject to review by the courts of Australia upon

5   application by parties in interest.  If such review is sought, the proceeding will take on a judicial

6   character while a judge reviews the request.  More importantly, however, if it appears to the liquidators

7   that there may not be sufficient funds to pay all creditors in full, the proceeding will generally have to

8   be converted into a form of external administration requiring more judicial involvement.  *Lofthouse*,

9   82 A.L.D. at ¶ 50.

10         In any event, section 101(23) requires only that a proceeding have either an administrative *or*

11  a judicial character.  Therefore, because the court finds that the voluntary winding up necessarily has

12  an administrative character, this element of section 101(23) is satisfied.

13                    **3.      A Collective Proceeding**

14         Section 101(23) also requires the proceeding be "collective."  A collective proceeding is one

15  that considers the rights and obligations of all creditors.  This is in contrast, for example, to a

16  receivership remedy instigated at the request, and for the benefit, of a single secured creditor.

17         A voluntary winding up fits this "collective" criterion.  As a leading Australian treatise states:

18  "Liquidation is, like bankruptcy, a procedure of an inherently collective nature . . . .  The procedure is

19  compulsory, in order to ensure that there is an orderly, cooperative system.  The result is that any

20  attempt by a creditor to undermine the collective nature of liquidation is outlawed."  GRONOW, *supra*,

21  ¶ 1.20, at 1-51.  Australian courts have also consistently held that private remedies, such as a

22  receivership or a private deed of arrangement, cannot accomplish the goals of a statutory winding up.

23  *Id.* at ¶ 1.40, at 1-51 (citing cases); Re Island Air Pty Ltd, (1983) 7 ACLR 844 (Austl.) (scheme of

24  ──────────────

25         [19]The payment in full is critical; "creditors have no involvement [in a voluntary winding up]
    because they will be repaid in full."  MICHAEL MURRAY, KEAY'S INSOLVENCY: PERSONAL AND
26  CORPORATE LAW AND PRACTICE ¶ 11.10, at 273 (6th ed. 2008).

arrangement); Re Tillers Pty Ltd, [1970] 3 NSWR 202 (Austl.) (similar); Re Swallow Footwear Ltd, (1956) 222 LT 229 (Austl.) (court-appointed receiver); *see also CA § 501.*[20]

The voluntary winding up provisions, combined with the case law from Australian courts, provide substantial evidence that this type of external administration is properly understood as collective. Thus, this criterion of section 101(23) is satisfied by Betcorp's proceeding.

### 4. Located in a Foreign Country

The voluntary winding up must be located in a foreign country. The special resolution commencing Betcorp's voluntary winding up was made at a meeting that was held at the company's registered office, which is located in Melbourne, Australia. The voluntary winding up is operating under the provisions of Australian law. The liquidators – whom are currently the only persons authorized to act for the company – are appointed pursuant to Australian law, and both are citizens and residents of Australia. Based on this evidence, the court finds that Betcorp's winding up is located in a foreign country, thereby satisfying this section 101(23) criterion.

### 5. Authorized or Conducted under a Law Related to Insolvency or the Adjustment of Debts

For Betcorp's winding up to qualify as a foreign proceeding, the winding up must be authorized or conducted under a law related to insolvency or the adjustment of debts. Importantly, this element does not require the company to be either insolvent or to be contemplating using the provisions of Australian law to adjust any debts.[21] Two facts favor a finding that Betcorp's winding up satisfies this

---

[20]The liquidator has a duty to account for the rights of all creditors in the course of distributing a company's property. *CA § 501.* Provisions of the *Corporations Act* facilitate and enhance this collective process by permitting a high degree of creditor involvement. For example, if a creditor so chooses, the liquidator must hold meetings to determine the need for the formation of creditor Committees of Inspection. *CA §§ 548-52.* If the liquidator refuses to form these committees, that decision is immediately appealable to a court, which in turn may order their formation. *Id.*

[21]*See* UNCITRAL, Working Group on Insolvency Law, *Draft Legislative Provisions on Judicial Cooperation and Access and Recognition in Cases of Cross-border Insolvency*, p. 9, at n.2, U.N. Doc. A/CN.9/WG.V/WP.44 (Mar. 8, 1996) (explaining that the phrase "or other law relating to

fifth criterion: (1) the unified structure of the external administration provisions of the *Corporations Act*; and (2) the Australian Parliament's own interpretation that Australia's company laws qualify under the Model Law.

As explained above, the *Corporations Act* regulates the whole of the corporate life-cycle of an Australian corporation. In this regard, several sub-parts of Chapter 5 contain provisions that deal with corporate insolvency and allow for the adjustment of debts. *See* Parts 5.3, 5.4A, and 5.4B of Chapter 5 of the *Corporations Act*. These facts, combined with the statutory ability to shift among various forms of dissolution given changing circumstances, demonstrate that winding up is achieved under a law relating to insolvency or the adjustment of debts.

Additionally, the court finds persuasive the Australian legislature's interpretation of its *Corporations Act*, published in connection with Australia's adoption of the Model Law. In Australia, proposed legislation is often accompanied by "explanatory memoranda" that serve as an aid to understanding the purpose and structure of the legislation. Pursuant to statutory authority, Australian courts may use these explanatory memoranda to interpret legislation that has been enacted. *See* Austl. Acts Interpretation Act 1901 (2009) § 15AB(2)(e) (providing that a court may use an explanatory memorandum to interpret legislation), *available at* http://www.comlaw.gov.au/ (click "Compilations - Current" under "Acts"; search for "C2009C00046"; click the PDF) (*last visited* Feb. 9, 2009). Given that this court may look to any relevant material or source to interpret foreign law, *see* FED. R. CIV. P. 44.1, the court will thus consider these memoranda as relevant sources and interpretative guides to Australian law.

The Senate of the Parliament of the Commonwealth of Australia has issued an "Explanatory Memorandum" which interprets Australia's version of the UNCITRAL Model Law, enacted as part of Australia's Cross-Border Insolvency Bill 2008. CROSS-BORDER INSOLVENCY BILL 2008,

---

insolvency" is intended to "allude to the fact that liquidations . . . might be conducted under other than, strictly speaking, insolvency laws" and giving the example of company laws), *available at* http://www.uncitral.org/pdf/english/travaux/insolvency/acn9-wg5-wp44-e.pdf.

EXPLANATORY MEMORANDUM, *available at* http://www.comlaw.gov.au/ (click "1996+ by title" under "Bills"; search for "C2008B00008"; select "Cross-Border Insolvency Bill 2008"; click "EM/Supp Material"; click the PDF) (*last visited* Feb. 9, 2009) [hereinafter "Explanatory Memorandum"].  That memorandum states:

> Many articles of the Model Law require an insertion for 'laws of the enacting State relating to insolvency' (or similar).  It is intended that the Model Law will apply to collective judicial or administrative proceedings pursuant to a law relating to bankruptcy or corporate insolvency.  As such, the relevant Australian laws are the Bankruptcy Act and Chapter 5 (other than Parts 5.2 and 5.4A) of the Corporations Act, and also section 601CL of the Corporations Act [Part 2, clause 8].

*Explanatory Memorandum* ¶ .13, at 7-8.

A voluntary winding up is governed by Part 5.5 of Chapter 5 of the *Corporations Act*.  It is telling that this is *not* one of the sub-parts excluded in the *Explanatory Memorandum*.  Accordingly, based upon the Australian legislature's interpretation of the UNCITRAL Model Law and Australian domestic law, a company engaged in a voluntary winding up is being administered under a law relating to insolvency.  This evidence supports the court's determination that Betcorp's winding up satisfies the "law relating to insolvency" criterion of section 101(23). Therefore, the court finds that this element of section 101(23) is satisfied.[22]

**6.    Foreign Court's Control or Supervision of the Debtor's Assets and Affairs**

Section 101(23) requires that the voluntary winding is conducted such that the assets and affairs of the debtor are subject to control or supervision by a foreign court.  In chapter 15, the term "foreign court" has a defined meaning.  Section 1502 of the Bankruptcy Code defines "foreign court" as "a

---

[22]The United States' expansion of the types of laws that can be considered – the addition in section 101(23) of laws related to "adjustment of debt" to laws related to "insolvency," see note 13 – bolsters this conclusion but is not necessary to it.  For proceedings for which this addition might be relevant, *see* Jennifer D. Morton, Note, *Recognition of Cross-Border Insolvency Proceedings: An Evaluation of Solvent Schemes of Arrangement and Part VII Transfers Under U.S. Chapter 15*, 29 FORD. INT'L L.J. 1312 (2006).

1    judicial or other authority competent to control or supervise a foreign proceeding."[23]

2    In Betcorp's case, the liquidators, Mr. Cathro and Mr. Wallace-Smith, have direct control of the

3    debtor's assets.  The ASIC, in turn, directly regulates all liquidators.  As stated in section 5B of the

4    *Corporations Act*, "Subject to the ASIC Act, ASIC has the general administration of this Act."  The

5    ASIC supervises liquidators in the performance of their duties, and requires that liquidators request

6    permission of the ASIC before undertaking certain actions.  *See, e.g.*, ASIC POLICY STATEMENT 81,

7    DESTRUCTION OF BOOKS (May 3, 2000) (requiring liquidators conducting a voluntary winding up to

8    submit a written request to the ASIC before destroying any books and records).  Also, pursuant to Part

9    9.2 of the *Corporations Act*, the ASIC may remove or revoke the authority of any person to be a

10   liquidator.  Therefore, a reasonable interpretation of the relationship between the ASIC and any

11   liquidator is that the ASIC itself is "an authority competent to control and supervise a foreign

12   proceeding" within the meaning of sections 101(23) and 1502.  *See In re* Tradex Swiss AG, 384 B.R.

13

---

14   [23]There is a slight problem with the use and interpretation of "foreign court" in section 101(23).
     The chapter 15 definition of "foreign court" is not directly applicable to chapter 1 of the Bankruptcy

15   Code in which section 101(23) is found.  *Compare* 11 U.S.C. § 103(k) (stating, with exceptions not
     relevant here, that chapter 15 applies only in cases under that chapter) *with id.* § 1502 (stating that the

16   listed definitions are "[f]or the purposes of this chapter [15]").  The question thus arises as to whether
     the definition of "foreign court" found in section 1502(3) can be used to interpret that same phrase in

17   section 101(23).

18   While recognizing that  the suggested reading – that an administrative agency is a court  – is
     somewhat contrary to plain meaning, this court will use the definition found in section 1502(3) to

19   construe section 101(23).  This deviation from accepted methods of statutory interpretation is justified
     by the international context of this case, and by Congress' directives, contained in section 1501 and

20   1508, to construe chapter 15 so that it is consistent with international understandings.

21   Initially, the Model Law was drafted with the definition of "foreign proceeding" and the
     definition of "foreign court" in the same Article.  *Compare* Model Law, Arts. 2(a) (definition of

22   "foreign proceeding") *with id.* Art. 2(e) (definition of "foreign court").  The separation of the two
     definitions in chapter 15 does not appear to have been done with the intent of limiting the scope of

23   section 101(23).  *See* HOUSE REPORT, *supra*, 110 (discussing definitions, including "foreign court,"
     as if adapted without change from Model Law).  To the contrary, section 1501(a)'s instruction is to

24   interpret chapter 15 in line with the Model Law so as to promote, among other things, "greater legal
     certainty."  11 U.S.C. § 1501(a)(3).  That certainly would be undermined if United States courts

25   refused to recognize, as a foreign proceeding, foreign liquidations and reorganizations simply because

26   they were being administered by an administrative agency rather than a judicial officer.

1  34, 42 (Bankr. D. Mass. 2008) (Swiss Federal Banking Commission held to be a foreign court under

2  chapter 15 because it controls and supervises liquidation of entities, such as debtor, that are in

3  brokerage trade).

4      Alternatively, the voluntary winding up proceedings are also subject to supervision by a more

5  traditional judicial authority: the Australian courts.[24]  Section 511 of the *Corporations Act* allows both

6  liquidators and creditors to request a court to determine "any question arising in the winding up of a

7  company."  Even in the absence of a creditor's appeal, the Australian courts have a broad mandate to

8  review actions of liquidators.  Under section 536, if it appears to a court that the actions of a liquidator

9  are in derogation of the *Corporations Act*, the court "may take such action as it thinks fit."  *See also*

10  Cresvale Far East (in liq) v. Cresvale Sec. Ltd, (2001) 39 A.C.S.R. 622, ¶ 63, 2001 WL 1353240

11  (Austl.) (reversed in part on unrelated grounds) ("In a voluntary winding up, the appointment of the

12  liquidator is consensual but a liquidator's duties and powers are prescribed by the Corporations Act,

13  and there are elements of supervision by the Court.").

14      Further, under section 1321 of the *Corporations Act*, any person "aggrieved by any act, omission

15  or decision of . . . a liquidator" may appeal to an Australian court.  The court may then "confirm,

16  reverse or modify the act or decision or remedy the omission, as the case may be, and make such orders

17  and give such directions as it thinks fit."[25]  *Id.*  If cause is shown, the court may remove the liquidator

18  from his or her position.  *CA § 503*; *cf. Tradex Swiss*, 384 B.R. at 42 (alternatively holding the Swiss

19  Federal Banking Commission to be a foreign court under chapter 15 because its decisions are subject

20  to review by Swiss courts).

21      Based on this evidence, the court finds that Betcorp's winding up proceeding is being conducted

22

23  _____

24      [24]As explained in section 58AA of the *Corporations Act*, "Court," as used in the Act, may,
   under the circumstances, refer to either the Federal Court of Australia or the Supreme Court of a State
   or Territory.

25

26      [25]Also, if a creditor does not believe a liquidator is dealing appropriately with its proof of claim,
   it "may apply to the Court for a decision in respect of it." *Corporations Regulations 5.6.53(2).*

such that the assets and affairs of Betcorp are subject to control or supervision by a foreign court, within the meaning of section 101(23).

### 7.    Reorganization or Liquidation Purpose

The final requirement of section 101(23) is that the purpose of the foreign proceeding be for reorganization or liquidation. A voluntary winding up is a statutory process under the law of Australia through which a company is liquidated. *See CA § 501.* The directors' minutes and memo to equity interest holders explain that the purpose of the winding up is to liquidate Betcorp. *See* Director's Minutes (dkt. #2, ex. 5, pp. 2-29). The special resolution commencing Betcorp's winding up indicates the same. *See* Resolution (dkt. #2, ex. 6, p.2). The declaration filed by Mr. Cathro also states that the purpose of the winding up is to liquidate the company. Cathro Decl. ¶¶ 25, 44. Therefore, the court finds this final element of section 101(23) is satisfied.

Having determined that each of the seven criteria required by section 101(23) are satisfied, the court finds that Betcorp's voluntary winding up is a "foreign proceeding." With this substantial preliminary question settled, the court now turns to the requirements for recognition that are stated in section 1517.

### B.    *Does Betcorp's Winding Up Proceeding Meet the Requirements for Recognition Under Section 1517?*

Section 1517 requires recognition of a foreign proceeding if:

> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
> (2) the foreign representative applying for recognition is a person or body; and
> (3) the petition meets the requirements of section 1515.

Assessing whether these three requirements are satisfied necessitates reference to other chapter 15 provisions and the Code's definition section. These elements are addressed in turn.

### *1.    Is the Foreign Proceeding for Which Recognition Is Sought a Foreign Main Proceeding or Foreign Nonmain Proceeding?*

Section 1517's first requirement is that the foreign proceeding for which recognition is sought is either a foreign main or a foreign nonmain proceeding.  In this case, Mr. Cathro specifically seeks Betcorp's winding up to be recognized as a foreign main proceeding.

Under section 1502(4), a foreign main proceeding is a "foreign proceeding pending in the country where the debtor has the center of its main interests."  As Betcorp's winding up qualifies as a "foreign proceeding," the question then becomes where Betcorp's  "center of main interests" or "COMI" as it is often referred to, is located.

COMI is not defined in the Bankruptcy Code or in the Model Law.  To aid courts in simple or uncontested cases, section 1516(c) states that, "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests."[26]  If this presumption applied, it is undisputed that at all times the debtor's registered office was in Australia.

1st Technology, however, has in good faith introduced evidence raising a legitimate question as to whether Betcorp's COMI is in Australia.  Because of this, this court cannot rely solely upon section 1516(c)'s presumption in determining whether Betcorp's COMI is in Australia.  It must consider all evidence, while keeping in mind that it is Mr. Cathro's burden to persuade the court, by a preponderance of the evidence, that Betcorp's COMI is in Australia.  *In re* Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. 325, 335-36 (S.D.N.Y. 2008) (quoting HOUSE REPORT, *supra*, at 112-13); *Tradex Swiss*, 384 B.R. at 43; *see* FED. R. EVID. 301 (explaining that a party's rebuttal of a presumption does not shift the burden of proof; rather, the risk of nonpersuasion remains upon the party on whom it was originally cast – in this case, the joint liquidators of Betcorp);

---

[26]"The presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy." HOUSE REPORT, *supra* at 113; *see In re* Basis Yield Alpha Fund (Master), 381 B.R. 37, 52-53 (Bankr. S.D.N.Y. 2008).

*see also In re* Tri-Continental Exchange Ltd., 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006) (discussing the 11 U.S.C. § 1516(c) presumption).

The next section, Part III.B.1.i, analyzes cases discussing and applying the COMI concept. Part III.B.1.ii then addresses a particular COMI issue raised by 1st Technology: should COMI be determined as of the time of the filing of the petition for recognition, or should the court look back and determine COMI in light of a debtor's operational history? Following that, Part III.B.1.iii will address Mr. Cathro's contention that Betcorp's COMI is located in Australia.

### i.    Factors Relevant to the COMI Determination

The term "center of main interests" is taken from the UNCITRAL Model Law. *Tri-Continental*, 349 B.R. at 633. The *Guide to Enactment* to that law indicates the phrase's origin to be in the EU Convention.[27] As stated in paragraph 31 of the *Guide to Enactment*:

> A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests". This corresponds to the formulation in the European Union Convention on Insolvency Proceedings (art. 3 of that Convention), thus building on the emerging harmonization as regards the notion of a "main" proceeding.[28]

*Guide to Enactment*, ¶ 31, at 12.

In the preliminary paragraphs of the EU Regulation, in turn, elaborate upon COMI as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." EU Regulation ¶ 13. As explained in a report generally thought to be expressive of the intent of the EU Convention, and upon which the EU Regulation is based:

> The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction . . . be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be

---

[27]The connections between the failed EU Convention and the current EU Regulation are examined in note 14, *supra*.

[28]This borrowing is confirmed by paragraph 72 of the *Guide to Enactment*:
> The expression "centre of main interests" in subparagraph (b) to define a foreign main proceeding is used also in the European Union Convention on Insolvency Proceedings.
*Guide to Enactment*, ¶ 72.

assumed in the case of insolvency to be calculated.

MIGUEL VIRGOS & ETIENNE SCHMIT, REPORT ON THE CONVENTION ON INSOLVENCY PROCEEDINGS ¶ 75, at 51 (1996), *available at* http://aei.pitt.edu/952/01/insolvency_report_schmidt_1988.pdf.[29]

Although examining these origins helps, it leaves much open; after all, the term "center of main interests" is not specifically defined, either in chapter 15 or the Model Law.  Such uncertainty was not intended.  One of the United States' representatives to the UNCITRAL meetings that produced the Model Law, Professor Jay Westbrook,  has explained that the adoption of the term in chapter 15 was not intended to create a new concept of location, but to build upon existing concepts:

> Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same. One example is use of the phrase "center of main interests," which could have been replaced by "principal place of business" as a phrase more familiar to American judges and lawyers.  The drafters of Chapter 15 believed, however, that such a crucial jurisdictional test should be uniform around the world and hoped that its adoption by the United States would encourage other countries to use it as well.

Jay Lawrence Westbrook, *Chapter 15 at Last*, 79 AM. BANKR. L.J. 713, 719-20 (2005) (citations omitted). This gloss on "center of main interests" – that it is virtually identical to the more commonly

_____

[29]This report was originally designed to be the authorized guide to the EU Convention.  While the EU Convention was never adopted, however, it still retains interpretative vitality so long as its origins are properly understood.  When discussing the provenance of this report, Professor Ian Fletcher has noted that:

> The exact status of the *Virgos-Schmit* Report is somewhat uncertain since it has never been officially placed in the public domain, although the text has been published in various languages, using the version prepared and revised by the linguistic experts of the EC Council during 1995-1996 in anticipation of formal publication in the *Official Journal*.

Ian F. Fletcher, *The European Union Regulation on Insolvency Proceedings*, reprinted in INSOL INTERNATIONAL, CROSS-BORDER INSOLVENCY: A GUIDE TO RECOGNITION AND ENFORCEMENT 19 (2003).  Professor Fletcher goes on to note that:

> To provide for some measure of atonement for the abrogation of the proposed explanatory report, many of the numbered Recitals [of the EU Regulation] attempt to provide a much-compressed summary of the information that the Report contained concerning many of the key provisions or expressions now embodied in the Regulation.

*Id.*

Although the Internet citation refers to "Schmidt," the report itself indicates that the author's name does not contain a "d."

used (at least in the United States) concept of "principal place of business" – has been analyzed recently by several domestic courts. *See also* Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L L. 1019, 1020 (2007) ("COMI is similar to standards like 'principal place of business,' 'chief executive offices,' or 'real seat' that one finds in many statutes in the United States and elsewhere.") [hereinafter "Westbrook, *Financial Storm*"].

In *Bear Stearns*, the only appellate case thus far to address chapter 15's COMI concept, official liquidators for two  hedge funds registered as Cayman Islands limited liability companies sought chapter 15 recognition for liquidation proceedings opened in the Cayman Islands.  In determining whether the funds' COMI was in the Cayman Islands, or elsewhere, the court began with *Tri-Continental Exchange's* observation that COMI could be "equate[d]" with "the United States' concept of 'principal place of business.'" *Id.* at 336 (quoting *Tri-Continental*, 349 B.R. at 629); *see also In re* Basis Yield Alpha Fund (Master), 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008).

The *Bear Stearns* court then recited the bankruptcy court's listing of potential factors that could be relevant to a COMI determination.  389 B.R. at 336.  These included:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* (quoting *In re* Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007)) (in turn quoting *In re* SphinX, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2007).  This formulation has been adopted or used by most courts that have subsequently addressed the components of COMI.  *See* Tradex Swiss, 384 B.R. at 42-43; *In re* Ernst & Young, Inc., 383 B.R. 773, 779 (Bankr. D. Colo. 2008); *Basis Yield*, 381 B.R. at 47; *In re* Loy, 380 B.R. 154, 162 (Bankr. E.D. Va. 2007).

Ultimately, *Bear Stearns* affirmed the bankruptcy court's finding that the debtor's COMI was not in the Cayman Islands, and thus the Cayman Islands proceeding was not entitled to recognition as

a foreign main proceeding.[30]  389 B.R. at 337-38.  Aside from being registered in the Cayman Islands, the bankruptcy court had found that the Funds had no other "adhesive connection" with that country.  374 B.R. at 129-30.  Further, no managers or employees were located in the Caymans, the Funds were administered from offices located in the United States, and neither the books and records of the Funds, nor the Funds' assets, were held in the Caymans.  *Id.*  In sum, the court denied recognition because the Funds existed in the Caymans as merely shells or "letterbox" companies.  *Id.* at 130 & n.8.

*Tradex Swiss* used the same analysis in a somewhat different setting.  There, a foreign exchange trading company had activities in Switzerland and the United States.  Swiss banking authorities had commenced an investigation into the debtor's activities; the testimony was that the Swiss regulator had oversight responsibility for all currency traders such as Tradex (because it acted as a securities broker as defined in Swiss law).  384 B.R. at 37-38.  The regulator had the power to act as a bankruptcy court for the restructuring or liquidation of securities brokers such as Tradex.  *Id.*

Tradex was registered as a Swiss company, but had offices in the United States and in Switzerland.  Tradex's trades were accomplished at its United States office, and the officer with signing authority over bank accounts was located there.  *Id.* at 39.  Its physical files were in Boston, and its email correspondence with customers originated there.  *Id.*  Its money was in United States' banks, and a plurality of its creditors (in number) and a majority in amount were in the United States.  *Id.*  The United States office had 18 employees, and the Swiss office had only 4, one of which was a girlfriend of a principal, and another was a cleaning person.  *Id.*

The foreign representatives wanted a halt to United States proceedings, including an involuntary chapter 7 case filed against the debtor.  To achieve this goal, they filed a chapter 15 case, seeking to establish that the debtor's COMI was in Switzerland, thus making the Swiss proceeding a foreign main proceeding.

---

[30]Indeed, the bankruptcy court had gone further and found that the debtor did not even have an "establishment" in the Cayman Islands, and denied recognition as a foreign nonmain proceeding as well.  The district court affirmed this finding and conclusion.  389 B.R. at 338-39.

The court did not grant recognition as a foreign main proceeding. Adopting the principal place of business framework, the court analyzed the debtor's business activities as of the chapter 15 filing. *Id.* at 42-43. The court found that the presence of a business location, and a principal, of the debtor in Switzerland was not enough to establish COMI there; rather, the fact that the debtor's cash, assets, main trading platform, and records were in the United States made the United States the debtor's COMI.[31] *Id.* at 43.

These domestic decisions do not stand alone. Cases from other countries also support a focus on the principal place of business.[32] An instructive case from the European Court of Justice is Bondi v. Bank of America, N.A. (*In re* Eurofood IFSC Ltd.), Case 341/04, 2006 E.C.R. I-3813, 2006 ECJ Celex Lexis 777, 2006 WL 1142304 (E.C.J. May 2, 2006). The case concerned an entity named Eurofood, which was a subsidiary of an Italian entity named Parmalat SpA. Eurofood's registered office was in Ireland, and it did business throughout that country. *Id.* at ¶ 17. In January of 2004, Eurofood was sought to be involuntarily wound up, pursuant to the provisions of Irish law. *Id.* at ¶¶ 19-20. That proceeding was immediately opened, and ultimately the Irish court found Ireland to be Eurofood's COMI. *Id.* ¶ 20.

Eurofood's parent Parmalat was, at the time of the commencement of the Eurofood Irish proceeding, itself the subject of an "extraordinary administration" proceeding in Italy. In conjunction with Parmalat's proceeding, an Italian proceeding was opened against Eurofood, and in late February 2004 that court found Eurofood insolvent and declared Italy to be Eurofood's COMI. Finally, in March,

---

[31]The Swiss proceedings were recognized, however, as a foreign nonmain proceeding because the facts indicated that Tradex had an establishment in Switzerland, just not a principal place of business. *Id.* at 43-44.

[32]Looking at these foreign cases is appropriate. Section 1508 states in interpreting phrases such as "center of main interests," "the court shall consider" how those phrases have been construed in other jurisdictions which have adopted similar statutes. This means looking not only at domestic cases, but also at cases decided by the courts of other countries. As stated in the legislative history, "[n]ot only are these sources persuasive, but they advance the crucial goal of uniformity of interpretation." HOUSE REPORT, *supra*, at 110.

the Irish courts determined that the Irish proceeding had primacy under the EU Regulation, found Eurofood's COMI to be in Ireland, and refused to recognize the decisions made in Eurofood's Italian proceeding. *Id.*

The European Court of Justice found that Parmalat, by virtue of its position as corporate parent, had ultimate control over Eurofood, but that Eurofood's main interests were objectively in Ireland, and were ascertainable to be in Ireland by third parties. *Id.* at ¶ 37. Given this conduct, the European court found that the relationship of parent and subsidiary was insufficient to rebut the the presumption that the registered office of Eurofood, Ireland, was Eurofood's center of main interests. *Id.*

Other cases confirm the strength of an ascertainable principal place of business even when it is not located in the country in which the debtor is registered or incorporated. In *Re* BRAC Budget Rent-a-Car Int'l Inc., [2003] EWHC 128 (Ch), 2003 WL 117146 (Eng.), for example, a company incorporated in Delaware and with its registered address in the United States, petitioned for an administration order under United Kingdom law. The company had never traded in the United States and, for the most part, conducted its business in the United Kingdom. In addition, most of its employees worked in England and had contracts of employment governed by English law. Given this background, the court found the debtor's COMI to be in the United Kingdom, thus giving it the power to take jurisdiction over the proceeding. A similar holding was issued in Collins & Aikman Corp. Group, [2005] EWHC (Ch) 1754, ¶ 38, 2005 WL 4829623 (Eng.), in which the court found that the debtor's centralization of human resources systems, cash systems, sales functions and engineering design function in England lead to a finding that England was the debtor's COMI. *See also* Scott A. Bomhof & Adam M. Slavens, *Shifting Gears in Cross-Border Insolvencies: From Comity to COMI*, 24 BANK. & FIN. L. REV. 31, 46-53 (2008).

In sum, a commonality of cases analyzing debtors' COMI demonstrates that courts do not apply any rigid formula or consistently find one factor dispositive; instead, courts analyze a variety of factors to discern, objectively, where a particular debtor has its principal place of business. This inquiry examines the debtor's administration, management, and operations along with whether reasonable and

ordinary third parties can discern or perceive where the debtor is conducting these various functions.[33]

### ii.    Timing of the COMI Determination

Even if the objective facts at the time of Betcorp's filing establish its COMI in Australia, 1st Technology has a further argument. It contends that the COMI determination should be made with reference to a company's operational history, and not merely by assessing where COMI lies on the petition date. If this perspective is adopted, so 1st Technology argues, it demonstrates that Australia is not Betcorp's COMI.

This argument is flawed. To accept it would frustrate the goals of using COMI to "harmonize" insolvency proceeding recognition transnationally, and it would make the determination of COMI imprecise and often incorrect.

A good example of the various policy choices is found in *In re* Ran, 390 B.R. 257 (Bankr. S.D. Tex. 2008). In *Ran*, an Israeli bankruptcy trustee sought recognition of the Israeli bankruptcy under chapter 15 as a foreign main proceeding. The bankruptcy involved an individual, one Yuval Ran, an Israeli citizen who had a prolonged history of business activities in Israel, but who had relocated to the United States and continuously resided in Texas for approximately a decade prior to the chapter 15 filing. *Id.* at 260-61.

*Ran* is a prime example of why the court cannot make the COMI determination with an eye

---

[33]Professor Westbrook, in *Financial Storm*, proposes that the determination of COMI be influenced not only by the predictability that the principal place of business standard provides, but also by the likelihood of selection of an acceptable substantive law. Westbrook, *Financial Storm*, *supra*, at 1020. Professor Westbrook's proposal is driven by the understandable desire to avoid the application of law chosen by the debtor which would lead to predictably abusive results for the debtor's creditors. *Id.* at 1030-35. The use of such debtor havens raises the difficulty that "both formally and in action, [the results produced by the haven law] is too likely to fall outside that range of acceptable outcomes. It may also lack essential procedural characteristics, such as sufficient transparency and an acceptable judicial system." *Id.* at 1032. The ultimate result would be a unwelcome drift back to territorialism and the unprincipled preference for local law. *Id.*

Whatever the merits of this proposal – and they are considerable – this court does not have to decide whether a COMI determination needs to consider the quality of the applicable substantive law. In this case, Betcorp's country of registry, its principal place of business, and the likelihood that an acceptable substantive law will govern its liquidation, all point to Australia as Betcorp's COMI.

toward a debtor's operational history.  Timing was a decisive issue in *Ran* because, in his past, Mr. Ran had substantial interests in Israel, but on the date of the petition for recognition, he had effectively no interests in that country.  *Ran*, 390 B.R. at 260.  In an argument closely tracking that of 1st Technology in this case, Mr. Ran essentially argued that the court must consider his entire operational history in making its COMI determination.  *Id.* at 300.

Prior to 1997, Mr. Ran was the CEO of a publicly-traded Israeli company and had been associated with nearly 100 Israeli companies.  *Id.* at 260, 285.  Some of the companies Mr. Ran was associated with began experiencing large losses, prompting Mr. Ran and his family to leave Israel and come to America.  *Id.* at 260.[34]  Since 1998, Mr. Ran had not conducted business in Israel.  *Id.*  Mr. Ran took up work in America, applied to be a United States citizen, and at the COMI hearing, he stated that he intended to remain in America for the rest of his life.  *Id.*  Nonetheless, the Israeli bankruptcy trustee argued fervently that a longitudinal assessment of Mr. Ran's business activities proved his COMI was in Israel. *Id.* The trustee pointed out that in 1999, an Israeli court – the District Court of Tel-Aviv-Jaffa – had appointed him as trustee to administer Mr. Ran's assets.  *Id.*

*Ran* rejected the trustee's arguments.  *Id.* at 300.  It based that rejection on a common sense argument:  If courts assess COMI with an eye to a debtor's operational history, there is an increased likelihood of conflicting COMI determinations, as courts may tend to attach greater importance to activities in their own countries, or may simply weigh the evidence differently.  Giving consideration to a debtor's operational history increases the possibility of competing main proceedings, thus defeating the purpose of using the COMI construct.  Requiring courts to give weight to the debtor's interests over the course of its operational history may destroy the uniformity and harmonization that is the goal of employing the COMI inquiry.

Moreover,  it is important that the debtor's COMI be ascertainable by third parties.  *Ran*'s analysis correctly proceeds on the assumption that COMI is affected not only by what a debtor does,

---

[34]There were also personal reasons.  His car and his brother's office were firebombed, and he and his family had received several death and kidnaping threats. 390 B.R. at 260-61 n.1.

but by what a debtor is perceived as doing. *See id.* at 274-75. If the debtor's main interests are in a particular country and third parties observe this situation, it should be irrelevant that the debtor's interests were previously centered in a different country. The presumption is that creditors will look to the law of the jurisdiction in which they perceive the debtor to be operating to resolve any difficulties they have with that debtor, regardless of whether such resolution is informal, administrative or judicial.[35]

In fact, an inquiry into the debtor's past interests could lead to a denial of recognition in a country where a debtor's interests are truly centered, merely because of past activities. This frustrates two of the purposes of the COMI inquiry – it decreases the effectiveness of the insolvency proceeding for which recognition is sought, and it may lead to a sub-optimal distribution of the debtor's assets, inasmuch as non-recognition where recognition is due may forestall needed inter-nation cooperation. *See* Westbrook, *Financial Storm*, *supra*.

As a result, *Ran* held that the appropriate time to determine COMI was when the chapter 15 case commenced. This is consistent with English cases interpreting the EU Regulation, which seem to select a time linked to the commencement or service of the relevant insolvency proceeding. Shierson v Vlieland-Boddy, [2005] EWCA (Civ) 974, ¶¶ 39, 55, 2005 WL 1860177 (Eng); Re Collins & Aikman Corp. Group, [2005] EWHC (Ch) 1754, ¶ 39, 2005 WL 4829623 (Eng).

### iii.    Betcorp's COMI

This brings the analysis to the determination of Betcorp's center of main interests. Viewing Betcorp as of the time of the petition for recognition, almost all of the factors considered by courts lead to a determination that Betcorp's COMI is Australia. *See Bear Stearns*, 389 B.R. at 336 (listing potentially relevant factors such as: the locale of debtor's headquarters; its management; its assets; its creditors and the jurisdiction whose law would apply to most disputes). The location of Betcorp's

---

[35]As *Ran* also recognizes, due regard must be given for the debtor's choice to conduct his business where he or she sees fit. *Id.* at 272-75 (citing Shierson v. Vlieland-Boddy, [2005] EWCA (Civ) 974, 2005 WL 1860177 (Eng.)).

registered office and the place from where the winding up is being administered is Australia.[36]  The location of those that manage Betcorp – the liquidators (since commencing the winding up divests the directors of their authority) – is Australia.  Betcorp has no employees, save and except for those selected by the liquidators.  Betcorp's primary asset; in fact, its only asset, is the cash in its Australian bank account.  The voluntary winding up is being conducted pursuant to the Australian *Corporations Act*, and therefore this is the law that would apply to most disputes.

The only factor that does not support a finding that Betcorp's COMI is Australia is the location of its creditors.  Betcorp currently has two creditors.  One is located in the United Kingdom, and will apparently be paid when the liquidators have settled all outstanding creditor disputes.  The other creditor is 1st Technology, which is located in the United States.  1st Technology argues that notwithstanding all of the factors indicating Betcorp's COMI is in Australia, the court should determine COMI is in the United States, based upon 1st Technology's allegations of patent infringement.[37]

Based on a consideration of all of the relevant factors and the evidence presented, the court finds that Betcorp's COMI is Australia.  This is the place from which Betcorp conducts the administration of its interests, and this fact has proved ascertainable not only by third parties, but by 1st Technology itself (e.g., the letters from 1st Technology regarding alleged patent infringement, and submitting its proof of debt to the Australian liquidators).  This finding is in line with recent English decisions under the EU Regulation finding that the identity of the country in which an individual debtor's debts were incurred was not a relevant consideration in establishing where COMI  might be.  *Shierson*, [2005] EWCA (Civ) 974; Official Receiver v. Eichler, [2007] B.P.I.R. (Ch D.) 1636, 2007 WL 4947537 (Eng.).

---

[36]Although the presumption of section 1516 does not apply in this case, that does not mean that the location of Betcorp's registered office is irrelevant.  *See Bear Stearns*, 389 B.R. at 336; *Tri-Continental*, 349 B.R. at 629-30.

[37]1st Technology also argues that the court should consider that many of Betcorp's former customers were from the United States.  The court declines this invitation, considering that Betcorp had no customers as of the date of the petition for recognition, and this date cabins the court's inquiry.

1    Consideration of the consequences of 1st Technology's argument also support Australian
2    COMI. If 1st Technology is correct, then Betcorp's COMI is in the United States, and only a United
3    States court could open a main proceeding for its assets and creditors. This court would then be faced
4    with administering the estate of an Australian company, with its assets and management some eighteen
5    time zones away, all for the sake of one lawsuit. This is especially wasteful when Australia, the other
6    candidate for Betcorp's COMI, has a liquidation process in place that is both rational and fair, and
7    which provides for full payment to creditors such as1st Technology, or if Betcorp proves insolvent, for
8    a fair aliquot share of any remaining assets.[38]

9    Further, even if the court accepted 1st Technology's invitation to determine COMI with respect
10   to the company's operational history – an invitation this court rejects – the outcome would not change.
11   When the company was first formed, its sole subsidiary operated only in Australia. As the company
12   grew, it began to operate subsidiaries in other countries, given rise to "interests" in each place it did
13   business. But as discussed in Part II of this opinion, at all times Betcorp's administrative and executive
14   nerve center was Australia. It is where its decisions were made and where most of its management and
15   shareholdings were concentrated. 1st Technology's evidence with respect to Betcorp's customers,
16   while relevant, is not as probative as the other objective and external indica of where Betcorp's
17   executive decisions were made. Against this, Mr. Cathro has introduced extensive evidence showing
18   Betcorp's COMI was and is Australia. Therefore, the court's decision on Betcorp's COMI would not
19   be changed by taking into account the operational history of the company. Based on the evidence
20   presented, Mr. Cathro has carried his burden of showing Betcorp's center of main interests to be in
21   Australia. Accordingly, the court finds the first element of section 1517 is satisfied and that Betcorp's

22   _____

23        [38]1st Technology's focus has been on having a United States court decide its United States
     patent claims. But chapter 15 recognition will not preclude that from occurring; rather, it simply
24   means that the company's liquidators will have the ability to make the initial determination as to where
     the claim will be liquidated. It could be that the liquidators may permit the United States lawsuit to
25   proceed, or the parties could agree to some other form of resolution. If 1st Technology disagrees with
     the liquidators' determination, this court is convinced that it will have appropriate recourse to
26   Australian courts to have that decision reviewed.

1  winding up is a "foreign main" proceeding.[39]

2          **2.      Is the Foreign Representative Applying for Recognition a Person or Body?**

3          The second requirement under section 1517 is that the foreign representative applying for

4  recognition is a person or body.  Section 101(24) defines the term "foreign representative" as "a person

5  or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding

6  to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a

7  representative of such foreign proceeding."  This requirement is satisfied in this case.

8          The court has already found that the voluntary winding up qualifies as a foreign proceeding

9  under section 101(23).  In that voluntary winding up, the liquidators are officially authorized by statute

10  to liquidate the debtor's assets.  *See CA § 506*; *see also id. § 501*.  The Betcorp member vote authorizing

11  the winding up specifically gave the liquidators control over the debtor's assets and allowed them to

12  liquidate those assets.    Cathro Decl. ¶¶ 19-22.    Mr. Cathro and Mr. Wallace-Smith are the only

13  representatives of the debtor currently authorized to act on its behalf and have been actively carrying

14  out the duties required of them as liquidators.  *See* Cathro Decl. ¶ 23.  Mr. Cathro, an individual and

15

16

17  _____

18          [39]Because the court has determined that Betcorp's winding up is a foreign main proceeding,
19  it need not discuss whether the proceeding would qualify as a nonmain proceeding, since the
    definitions of main and nonmain make those terms mutually exclusive.  *See* 11 U.S.C. §§ 1502(4) and
20  (5).  This also renders moot 1st Technology's request for denial of recognition on the basis that
    Betcorp does not have an "establishment" in Australia because of its liquidation.  *See* 11 U.S.C. §
21  1501(2) (definition of establishment).
            The existence of an establishment in the country in which the proceeding is pending is only
22  relevant to the determination of whether a foreign proceeding is a "foreign nonmain proceeding."
    Only that definition uses the definition of "establishment."  *Compare* 11 U.S.C. § 1517(b)(1)
23  (providing for recognition as foreign main proceeding if proceeding is pending in country where debtor
    has center of main interests) *with id.* § 1517(b)(2) (providing for recognition as a foreign nonmain
24  proceeding if proceeding is pending in country where the debtor has an establishment).  Since foreign
    main and foreign nonmain proceedings are mutually exclusive, and since the court has found that
25  Betcorp's winding up qualifies as a foreign main proceeding, there is no legal need to make any
    findings on whether or where Betcorp has an "establishment."
26

1  the liquidator named in the petition for recognition, is therefore both a person[40] and a "foreign

2  representative" applying for recognition.  The court thus finds this second requirement of section 1517

3  is satisfied.

4            **3.        Does the Petition Meet the Requirements of Section 1515?**

5            The final item necessary for recognition is that all four requirements of section 1515 are met.

6  11 U.S.C. § 1517(a), (b)(1)-(3).  Section 1515's first requirement is found in subsection (a) and simply

7  that the foreign representative has filed a petition for recognition.  11 U.S.C. § 1515(a).  Mr. Cathro has

8  complied with this requirement.  *See* Petition for Recognition (dkt. #1).

9            The second requirement of section 1515 is found in subsection (b).  It requires that the petitioner

10 establish that a foreign proceeding exists and that the petitioner has been appointed as the foreign

11 representative.  The first two paragraphs of section 1515(b) provide for the sufficient evidence; they

12 specify that the petitioner may satisfy this requirement by providing a "certified copy of the decision

13 commencing such foreign proceeding and appointing the foreign representative" and "a certificate from

14 the foreign court affirming the existence of the foreign proceeding and the appointment of the foreign

15 representative."  11 U.S.C. § 1515(b)(1) & (2).   In cases such as Betcorp's, however, in which there

16 is no formal court proceeding, the statute may be satisfied with "any other evidence acceptable to the

17 court of the existence of such foreign proceeding and of the appointment of the foreign representative."

18 11 U.S.C. § 1515(b)(3).

19           Mr. Cathro has satisfied the second requirement.  In conjunction with the filing of its petition

20 for recognition, Mr. Cathro filed a document from the ASIC showing that liquidators had been

21 appointed pursuant to provisions of the *Corporations Act*.  *See* Form 505 (dkt. #2, ex. 6, pp. 4-5).

22 Given that section 1502(3)'s definition of "foreign court" refers to "a judicial *or other authority*

23

24 ───────────────

         [40]The Bankruptcy Code states that "[t]he term person includes individual, partnership,
25 and corporation . . . ."  11 U.S.C. § 101(41).  As Mr. Cathro is an individual – that is, a living human
    being – the court need not construe what is meant by "body," a term undefined in either chapter 1 or
26 chapter 15 of the Bankruptcy Code.

competent to control or supervise a foreign proceeding," documents from the ASIC, for reasons stated earlier, suffice for this requirement.[41]   In combination with the other evidence presented, this documentary evidence submitted by Mr. Cathro satisfies this section 1517(a)(3).

The third requirement under section 1515 is that the petition for recognition is accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.  11 U.S.C. § 1515(c).  Mr. Cathro's declaration explains that the Australian proceeding is the only foreign proceeding the debtor is involved with, and therefore the court finds this requirement is satisfied. *See* Verified Petition Under Chapter 15 For Recognition of a Foreign Main Proceeding ¶¶ 28-31 (dkt. #2); *see also* Cathro Decl. ¶ 44.

The fourth and final requirement is simply that certain documents be translated into English. 11 U.S.C. § 1515(d).  As the native language of all documents produced is English, this requirement is also satisfied.

Accordingly, all requirements of section 1515 are satisfied.

### IV. CONCLUSION

As all of the requirements under section 1517(a) have been met, the petition for recognition is granted.  In accordance with section 1517(b), Betcorp's winding up is hereby recognized as a foreign main proceeding.  This opinion shall constitute the court's findings of fact and conclusions of law, in accordance with FED. R. BANKR. P. 7052 (incorporating FED. R. CIV. P. 52), made applicable to this proceeding under FED. R. BANKR. P. 1018.  The court will enter a separate order under FED. R. BANKR. P. 9021.

IT IS SO ORDERED.

Copies sent to:

BNC MAILING MATRIX

---

[41] (emphasis supplied).  There is no issue of the applicability of section 1502(3)'s definition in this context, as section 1515 is found in chapter 3, the stated scope of the definitions in section 1502.

1  JEFFREY R. HALL     jhall@hutchlegal.com, kthompson@hutchlegal.com

2  WADE W. RABENHORST     wwr@campbellandwilliams.com,
   tiffany@campbellandwilliams.com

3
   J. COLBY WILLIAMS     tiffany@campbellandwilliams.com,
4  jcw@campbellandwilliams.com;nancy@campbellandwilliams.com

5  RYAN B. BENNETT
   200 E. RANDOLPH DR.
6  CHICAGO, IL 60601

7  Carl R. Clark
   Lentz & Clark, P.A.
8  9260 Glenwood
   P.O. Box 12167
9  Overland Park, KS 66282

10 Jeffrey A. Deines
   Lentz & Clark, P.A.
11 9260 Glenwood
   P.O. Box 12167
12 Overland Park, KS 66282

13 Christopher Redmond
   Husch Blackwell Sanders LLP
14 1200 Main Street
   Suite 2300
15 Kansas City, MO 64105

16

17                                                      # # #

18

19

20

21

22

23

24

25

26